**UNITED STATES of America, Plaintiff,**

v.

**CHRYSLER CORP. and Mack Trucks, Inc., Defendants.**

**Civ. A. No. 709-64.**

United States District Court
D. New Jersey.
Aug. 17, 1964.

David M. Satz, Jr., U. S. Atty., by Walter D. Murphy, Washington, D. C., and John M. O'Donnell, Daniel R. Hunter, Dept. of Justice, for the Government.

Pitney, Hardin & Kipp, by Frank C. O'Brien, Newark, N. J., for defendants. Milton Handler, Kaye, Scholer, Fierman, Hays & Handler, by Stanley D. Robinson, Kelley, Drye, Newhall, Maginnes & Warren, by Theodore R. Iserman, New York City, of counsel.

WORTENDYKE, District Judge.

In this action the plaintiff, United States of America, hereinafter Government, seeks injunctive relief by way of prevention of the consummation of a certain agreement, dated as of May 12, 1964, which has been entered into between Chrysler Corp., hereinafter Chrysler, and Mack Trucks, Inc., hereinafter Mack, providing for the purchase by Chrysler of all of the assets and business of Mack in exchange for certain convertible debentures of Chrysler in a principal amount estimated to be between $138,650,600 and $164,337,050.[1] The relief sought by the Government is predicated upon the allegations in the verified complaint, filed July 30, 1964, which charge that the consummation of the Purchase Agreement by the defendants will violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court's jurisdiction is appropriately invoked under Section 15 of the Clayton Act, 15 U.S.C. § 25, and Section 4 of the Sherman Act,

15 U.S.C. § 4, and venue is appropriately laid in this District by reason of the fact that although Chrysler is a corporation of the State of Delaware and Mack is a corporation of the State of New York, both transact business within the State of New Jersey, 15 U.S.C. § 22. Both defendants have appeared and defended in the cause, and concede that each is engaged in interstate commerce within the meaning of the respective sections of the Clayton Act and of the Sherman Act under which the Government seeks relief.

Upon the affidavit of Walter D. Murphy, Esq., an attorney employed by the Antitrust Division of the United States Department of Justice, filed with the complaint in this cause, a temporary restraining order was issued, prohibiting the defendants, their officers, directors, agents, employees and all other persons acting in their behalf, from taking any further action to consummate the acquisition of the business and assets of Mack by Chrysler; and from making any changes directly or indirectly in the corporate structure, commercial operations and properties of the defendants; other than in the regular and ordinary course of business. The same order provided, however, that its restraint should not extend to the meeting of the shareholders of Mack, which had been previously duly noticed to be held on August 11, 1964, for the purpose of ratifying the action of Mack's board of directors in entering into and authorizing Mack's consummation of the acquisition agreement and plan referred to in the notice of the stockholders' meeting dated July 8, 1964.

On July 31, 1964 upon the Government's application, based upon affidavits filed simultaneously therewith, the Court issued its order directing Chrysler and Mack to show cause on August 7, 1964, why a preliminary injunction should not issue, pursuant to the prayer of the complaint, pending trial of the case on the merits. In opposition to this application for preliminary injunction affidavits were

---

1. The precise amount was made to depend on the exercise of certain outstanding warrants and employee stock options of Mack.

timely filed in behalf of the defendants. Upon return of the order to show cause, oral testimony and documentary exhibits were presented in supplementation of the averments contained in the moving and answering affidavits. The hearing upon the return of this order to show cause continued beyond the expiration date fixed in the temporary restraining order; but during that hearing, the restraint of the order was extended by the Court with consent of the parties. At the conclusion of the hearing, on August 10, 1964, the parties agreed that the restraint imposed by the order should be deemed to be continued pending the Court's decision upon the pending application for preliminary injunction. During the period of the extension of the restraint, drafts of proposed findings of fact were submitted to the Court by the respective parties, and a reply brief in behalf of the Government was submitted to and considered by the Court.

The terms of a written agreement, dated as of May 12, 1964, and duly executed in behalf of each of the defendant corporations pursuant to authorization of their respective boards of directors, provided for a sale of all of the assets and business of Mack to Chrysler in exchange for Chrysler 4⅜% Subordinated Debentures due January 1, 1985, convertible on or before December 31, 1969, and the assumption by Chrysler of all of Mack's liabilities and obligations. The parties further agreed therein that, following the consummation of the sale, Mack would be completely dissolved and liquidated, and that, as soon as feasible after the closing date, August 12, 1964, Mack would withdraw all authority to do business as a foreign corporation in States other than the State of its incorporation; and that promptly after Mack's dissolution, and in accordance with the laws of the State of New York, it would be completely liquidated by the payment in cash of the full amount due its preferred stockhold-ers ($54.00 per share plus accrued dividends), and by the distribution, by the designated liquidating agent, of Chrysler debentures to Mack common stockholders, at $50.00 principal amount of debentures for each share of Mack common stock.

The agreement further provided that Mack's board of directors might, without further action of its stockholders, abandon the plan prescribed by the Purchase Agreement if the Agreement were terminated in accordance with its terms. Among the conditions precedent to Chrysler's obligation to consummate the purchase as stated in the agreement are (1) the approval of the plan by the holders of at least two-thirds of all Mack stock, with not more than 5% of the common stock dissenting;[2] (2) consent of the holders of Chrysler's 3½% promissory note to the creation and assumption of indebtedness incident to the acquisition of Mack; (3) procurement by Mack of consents of the holders of its 5⅛% Subordinated Debentures and its 5⅜% senior notes, to such modification as Chrysler might require; and (4) procurement by Mack of such modifications as Chrysler might require in Mack's outstanding contracts and in its various employee, pension, retirement and other benefit plans. The Agreement further provided that either of the parties thereto might terminate the purchase Agreement at any time if an action or proceeding were instituted or threatened which, in the opinion of counsel for the party desiring to terminate, made it "impossible or inadvisable" to consummate the transaction. The Agreement also expressly contemplated its termination at any time by the mutual consent of the boards of directors of the parties to it.

The closing under the Agreement was fixed by the terms thereof for August 19, 1964 (thereafter advanced to August 12, 1964), subject to the right in either of the parties to postpone the closing for

2. Defendants have advised the Court that on August 11, 1964, the Purchase Agreement received the necessary Mack stockholder approval.

not more than 45 days.[3] The mutual consent of the respective boards of directors of the defendants was, by the terms of the Agreement, sufficient to permit of the abandonment and termination of the Agreement at any time prior to its closing, without resultant liability on the part of either of the parties to the other. In the event the closing contemplated by the Agreement was not consummated, each of the parties became obligated to pay its own expenses in connection therewith.

Pursuant to the requirements of Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact upon the affidavits filed and the evidence received upon the return of the order to show cause why a preliminary injunction should not be allowed:

Chrysler is a progressive, diversified corporation engaged primarily in the manufacture and sale of automotive products, including trucks. It is the third largest corporation in the automotive industry and the seventh largest industrial corporation in the United States. It ranks fourth in size among the corporations manufacturing and selling motor trucks. Chrysler's after-tax earnings have increased in recent years. In 1963 its total net sales were approximately $3.5 billion. Its earnings in 1963 were a record high of $161.6 million as compared with $32.2 million in 1960, $11.1 million in 1961 and $65.4 million in 1962. Its total assets on December 31, 1963 were approximately $2.1 billion.

Mack manufactures and sells, principally, motor trucks having a gross vehicle weight of 26,000 pounds or more,[4] and is the nation's oldest and largest manufacturer of heavy duty motor trucks. Its 1963 sales of $305.8 million were the highest in the company's history. It ranked 181st among American industrial corporations, and as of December 31, 1963, its total assets were $235,836,711.

Although, during the course of the argument and in the affidavits submitted in behalf of the defendants, it was represented to the Court that Chrysler intended, after acquisition of the assets and business of Mack, to operate Mack's business as a division of the business of Chrysler, the purchase Agreement contains no provision to that effect; nor is it expressed in the plan of complete liquidation and dissolution which Mack's shareholders were asked to, and did, approve.

Upon the evidence submitted, it appears to this Court that there is a reasonable probability that the Government will prevail upon a plenary trial of the cause on the merits. There has been a prima facie showing that the consummation of

---

3. The closing has been adjourned from day to day pending the Court's ruling upon the pending application for a preliminary injunction, in accordance with the temporary restraining order.

4. Automotive trucks are classified in the industry according to their gross vehicle weight (g.v.w.), i. e., the weight of the truck together with the weight of the maximum load which it is designed to accommodate. These classifications are as follows:

| Group | G.V.W. |
|---|---|
| 1 | 6,000 lbs. and less |
| 2 | 6,001 to 10,000 lbs. |
| 3 | 10,001 to 14,000 lbs. |
| 4 | 14,001 to 16,000 lbs. |
| 5 | 16,001 to 19,500 lbs. |
| 6 | 19,501 to 26,000 lbs. |
| 7 | 26,001 to 33,000 lbs. |
| 8 | 33,001 lbs. and over. |

Trucks in Groups 7 and 8 are commonly referred to as heavy duty trucks. In 1963 Mack's truck sales totalled 13,305 units, made up of 407 units in Group 6, 2,054 units in Group 7 and 10,844 units in Group 8. For the same year, Chrysler's total unit sales were 75,025 made up of 36,141 units in Group 1, 22,512 units in Group 2, 3,311 units in Group 4, 7,000 units in Group 5, 4,763 units in Group 6, 889 units in Group 7, and 409 units in Group 8. Neither defendant sold any units in Group 3. Mack makes no trucks in Groups 1 through 5, which represent 92% of Chrysler's truck registrations. All of Mack's trucks are in Groups 6, 7 and 8, which account for only 8% of Chrysler's truck registrations. 96.9% of Mack's trucks are in Groups 7 and 8, whereas only 1.7% of Chrysler's trucks are in these groups.

the purchase Agreement by the defendants will be violative of Section 7 of the Clayton Act.

The United States as a whole is the appropriate "section of the country" within the meaning of that phrase as used in Section 7 of the Act, with which we are here concerned.

The following table discloses the market share and position of each of the defendants in each of the lines of commerce relevant to Section 7 of the Clayton Act:

| Line of Commerce | Chrysler | | | Mack | | |
|---|---|---|---|---|---|---|
| | Share (%) | | Rank | Share (%) | | Rank |
| All trucks | 7.2 | | 4 | 1.0 | | 7 |
| 19,500–26,000 lbs. | 5.2 | | 6 | 0.6 | | 7 |
| 26,001–33,000 lbs. | 3.0 | | 6 | 12.8 | | 4 |
| 33,001 lbs. and over | 0.8 | | 7 | 16.6 | | 3 |
| Diesel trucks over 19,500 lbs. | 0.9 | | 6 | 25.4 | | 2 |

For the purpose of their argument in opposition to the application for preliminary injunction, defendants accept the Government's definitions of the relevant commodity markets and lines of commerce against which the effect upon competition of the accused acquisition is to be appraised.

There is already great concentration in the truck industry and in its submarkets. The share of the market controlled by the so-called "Big Four" (General Motors, Ford, International Harvester and Chrysler) ranges from 83% to approximately 90% in the lines of commerce referred to in the foregoing schedule. This concentration in the manufacture and sale of trucks in each of the lines of commerce would be substantially increased should Chrysler acquire Mack.

During the period 1950–1963, Big Four sales in the 19,501 to 26,000 pounds category increased from 59.8% to 87.4%, and in the categories in excess of 26,000 pounds, from 26.7% to 53.9%. The proposed acquisition of Mack by Chrysler would increase the share of the Big Four in each of these categories in substantial degree.[5]

Mack was a pioneer in the manufacture and sale of heavy duty trucks, and is an industry leader in that field. It possesses an extensive marketing and technical organization skilled in the sale and service of its products, and is a financially sound and independent manufacturer thereof.

5. In addition to Mack, there are five substantial competitive producers of heavy duty trucks. The largest of these is International Harvester Company (listed as one of the Big Four herein), registering, in 1963, 37.6% in Group 7 and 25.2% in Group 8. Its sales were just under $2.0 billion for the fiscal year ended October 31, 1963, and its earnings increased from $36.3 million in 1954 to $68.3 million in 1963. White Motor Company is the second largest heavy duty truck producer, ranking second in Group 7 with 24.2% and third in Group 8 with 20.4%. It markets its trucks under the names of White, Autocar, Reo, Diamond T and Freightliner. Among White's six acquisitions since 1955, is that of the Industrial Diesel Engine Division of National Supply Co. Ford (another of the Big Four) ranks fourth in size as a manufacturer of heavy duty trucks. By the end of 1963 its sales of all products were $8.7 billion and its assets $5.9 billion. General Motors, the world's largest industrial corporation (which, with Chrysler, Ford and International Harvester, makes up the Big Four) ranks fifth in the sale of heavy duty trucks. Its 1963 sales of all products were $16.5 billion and earnings $1.6 billion. The sixth largest heavy duty truck producer is Pacific Car and Foundry Company, with 96% of its heavy duty truck production in Group 8, representing 7% of all trucks produced in that group. While Pacific Car sells principally in eleven Western States, it is expanding its sales in the Mid-West and East.

That Chrysler presently competes with Mack in the manufacture and sale of motor trucks is uncontradictedly disclosed by the evidence. Although Chrysler has concentrated on the sale of light duty trucks in the past, it presently offers trucks in all weight categories excepting Group 3, but including heavy duty trucks, and possesses a number of dealerships, independently owned truck centers and company-owned factory branches for use in marketing its heavy duty trucks. In addition to Mack, there are five substantial producers of heavy duty trucks in vigorous competition with one another.

Chrysler is financially capable of internal expansion, and contemplates expenditure of a billion dollars in the period 1964–1967 for plant and equipment, excluding special tooling. Chrysler has announced plans for substantial investment for the expansion of its heavy truck marketing facilities, but this contemplated· investment would be unnecessary should it acquire Mack and thus secure the elimination of Mack's substantial competition in this field.

Chrysler presently purchases its entire truck diesel engine requirements from diesel engine manufacturers. Mack, on the other hand, is a well-established, experienced manufacturer of high quality diesel engines for use in motor trucks, and it follows that if Chrysler acquires Mack, Chrysler's diesel engine suppliers may be foreclosed from a substantial present and future share of the market for their products. This would result in a lessening of competition in the sale of diesel engines to truck manufacturers,—at least to Chrysler.

The evidence before me is persuasive that the acquisition of· Mack by Chrysler in accordance with the terms of the pending Purchase Agreement will eliminate Mack's substantial competition in the truck industry and remove it as a leading competitor in the heavy duty submarket. This will increase concentration both in the truck industry as a whole and in the heavy duty and diesel truck submarkets. The acquisition will obviously destroy all competition between Mack and Chrysler and thus remove the objective of Chrysler's announced internal expansion plans toward becoming a sixth major factor in the production of heavy duty trucks. The acquisition is also likely to encourage remaining independent producers in the heavy duty truck field to merge with one of the integrated full line companies or with one another, which would further increase the concentration.

Defendants' argument that there has been no showing of irreparable injury to warrant a preliminary injunction is irrelevant. Sec. 7 of the Clayton Act expresses a Congressional proscription of such an acquisition where its effect "may be substantially to lessen competition, or to tend to create a monopoly." This proscription is a legislative declaration that an acquisition having such an effect is against the public interest. The Government need not show that it will suffer irreparable damage *qua* Government, but only that there is a probability that it would prevail upon a trial on the merits. The public interest in preventing a violation of Sec. 7 outweighs considerations of losses to speculating or investing stockholders resulting from the prevention of possible enhancement in stock value which might result from the acquisition.

Anticompetitive effects similar to those charged as likely to result from the pending acquisition upon the relevant markets and submarkets, were considered in Brown Shoe Company v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510, which stated and discussed criteria for determining whether or not a violation of Sec. 7 of the Clayton Act appeared in a contemplated merger. The principles enunciated in Brown Shoe were reiterated in United States v. Philadelphia National Bank, 1963, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915, and, more recently, in United States v. El Paso Natural Gas Company, 1964, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, and United States v. Continental Can Co., 1964, 378 U.S. 441, 84 S.Ct. 1738, 12 L.

658

Ed.2d 953. In the last cited case, at p. 1747 of 84 S.Ct., the Court said:

> "Market shares are the primary indicia of market power but a judgment under § 7 is not to be made by any single qualitative or quantitative test. The merger must be viewed functionally in the context of the particular market involved, its structure, history and probable future. Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of § 7's design to prevent undue concentration. Moreover, the competition with which § 7 deals includes not only existing competition but that which is sufficiently probable and imminent."

The following factors are to be taken into account in assessing the probability that a proposed merger would substantially lessen competition and thereby violate Sec. 7:

> "[T]he number and power of the competitors in the relevant market; the background of their growth; the power of the [corporations to be merged] * * *; the relationship of their lines of commerce; the competition existing between them and the power of each in dealing with the competitors of the other; the setting in which the [merger] * * * was created; the reasons and necessities for [the merger's] * * * existence; the [merged entities'] * * line of commerce and the relationship thereof to that of its [participants] * * *; the adaptability of [the merged entities'] * * * line of commerce to noncompetitive practices; the potential power of the [merged entities] in the relevant market; an appraisal of what the competition in the relevant market would [be] * * * if one of the [participants] * * * had" remained separate instead of merging. United States v. Penn-Olin

Chemical Company, 1964, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775.

■ The elimination of Mack, a vigorous independent competitor, from the market scene is a persuasive basis for inference that the pending proposed merger of the defendants will probably result in a substantial lessening of competition. United States v. Aluminum Company of America, 1964, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314. The evidence presently before this Court in the instant case amply supports a finding of probability that consummation of Chrysler's acquisition of Mack will violate the proscription of Sec. 7 of the Clayton Act.

■ The possibility that the Government's success after a plenary trial may be rendered effective by future divestiture of Mack from Chrysler does not render inappropriate preliminary injunctive relief. Most apposite to the situation which would be presented upon divestiture proceedings is the language in United States v. Ingersoll-Rand Co., D.C. Pa.1963, 218 F.Supp. 530, affd. 3 Cir. 1963, 320 F.2d 509. In that case, the District Judge said, at p. 542, in a factual situation paralleling that presently before this Court:

> "I find it difficult to understand the defendants contention that this case be allowed to go to final hearing without injunction, and that if a violation of Sec. 7 has occurred that the remedy of divestiture then be effected. Considering the hardships of divestiture actions with their ramifications and complications and their painful impacts upon all whom they touch, it is hard to understand that such a device can be reasonably considered as the ultimate remedy to be employed here. * * * It is as Mr. Chief Justice Warren says in Brown Shoe Co., * * * 'We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency * * *'."

In affirming the District Court in granting a preliminary injunction in Ingersoll-

Rand, the Court of Appeals, per Biggs, C. J., said, at p. 525:

"[W]e take the view that all the United States is required to establish at the present stage of this case is the * * * lessening of competition and a showing of a reasonable probability of success on final hearing * * * The trial court had to weigh the possibility of injury to the defendants, the effect of divestiture as opposed to injunctive relief, and the respective positions of the parties. It decided in favor of granting injunctive relief to the United States."

■ A balancing of the equities favors the granting of the preliminary injunction. These defendants are chargeable with knowledge of the proscription contained in Sec. 7 of the Clayton Act and with anticipating the probability that the proposed acquisition of Mack by Chrysler will adversely affect competition. Since the plan was publicly disclosed, the Antitrust Division of the Department of Justice has manifested interest in the proposed acquisition and has made numerous inquiries of the defendants respecting their businesses and plans. The terms of the Purchase Agreement itself disclose that the parties contemplated possible obstacles in the way of its consummation, including the possibility that litigation might be instituted which might prevent or render impractical the consummation of the Agreement. During the argument upon the return of the order to show cause, and in the affidavits of executives of the respective defendants, the Court was told that if a preliminary injunction should be granted, the contemplated transaction between the defendants would be voluntarily terminated. The Purchase Agreement contemplates that, in the event of a termination of the Agreement, each of the parties thereto would assume its own expenses in connection with the negotiations resulting therein and in the procedure anticipating the consummation thereof. The harm, if any, to the defendants which would result from the granting of a preliminary injunction would be such as the parties fully anticipated and provided for. Such a preliminary injunction will simply maintain the status quo between the defendants pending a plenary trial, provided the defendants themselves do not voluntarily terminate the transaction and thereby eliminate all possibility of consummation thereof, even in the event that the Government ultimately is unsuccessful on the merits. On the other hand, if the consummation of the acquisition be *not* restrained pending final adjudication in the cause, Mack's position as a profitable, independent manufacturer and effective competitor in the relevant markets would completely vanish. Its corporate existence would disappear, and if the Government were to be successful in finally securing the relief sought in its complaint, the possibility of divestiture and of restoring to viability the dissolved and liquidated Mack corporation would present problems which might prove insurmountable. Mack is presently a strong competitor in the field of heavy duty truck manufacture and sales. It has acquired facilities, know-how and goodwill. If these are destroyed or eliminated, the restoration of the existing status quo, which the preliminary injunction would preserve, will probably be impossible.

In addition to charging a violation of Sec. 7 of the Clayton Act, the complaint charges that the contemplated acquisition will violate Sec. 1 of the Sherman Act as an unlawful combination in unreasonable restraint of interstate trade and commerce. Here, as in United States v. Philadelphia National Bank, supra, I need not, and therefore do not reach the question of the alleged violation of Sec. 1 of the Sherman Act since the evidence before me clearly discloses the probability that the Government will be able to prove its charged violation of Sec. 7 of the Clayton Act.

■ Upon the foregoing findings and conclusions, a preliminary injunction should be and is hereby granted, enjoining the defendants Chrysler and Mack, their officers, directors, agents, employees.

## 660

and all other persons acting in their behalf, from taking any further action (other than the holding of the meeting of Mack's stockholders which has already occurred) to consummate the Purchase Agreement of May 12, 1964 between the defendants, and from making any changes directly or indirectly with respect to the capital stock or in the corporate structure or properties of Mack, or in the operations and policies of said defendant with respect to the manufacture and sale of any of its products, pending final adjudication of the complaint in this cause.