**UNITED STATES of America,**
**Plaintiff,**

v.

**ATLANTIC RICHFIELD COMPANY and**
**Sinclair Oil Corporation, Defendants.**
**69 Civ. 162.**

United States District Court
S. D. New York.

Feb. 17, 1969.

See also D.C., 297 F.Supp. 1060.

David R. Melincoff, Donald H. Mullins, Attys., Dept. of Justice, for the United States.

Hughes Hubbard & Reed, New York City, Jerome G. Shapiro, Otis Pratt Pearsall, John A. Donovan, New York City, of counsel, Henry B. Weaver, Jr., Gen. Counsel, J. Quinn O'Connell, Washington, D. C., Sp. Counsel, for Atlantic Richfield Co.

G. B. Mallum, V. A. Gorman, New York City, Vinson, Elkins, Weems & Searls, Houston, Tex., David T. Searles, Harry M. Reasoner, Houston, Tex., of counsel, for Sinclair Oil Corp.

## OPINION

FREDERICK VAN PELT BRYAN, District Judge:

The Government brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, to enjoin the proposed merger of defendant Sinclair Oil Company (Sinclair) and defendant Atlantic Richfield Company (Atlantic) on the ground that the merger would violate Section 7 of the Clayton Act,[1] 15 U.S.C. § 18.

The Government has now moved by order to show cause [2] for a temporary injunction against consummation of the merger pending determination of the merits of the action. On the motion the parties rely mainly on affidavits and statistical data. Additional facts were developed at an evidentiary hearing before the court.

Both Altantic and Sinclair are large integrated oil companies and are among the nineteen major integrated oil companies in the United States.

Atlantic has total assets of $1,885,991,-000 and ranks eleventh in assets among such companies. Its total revenues in 1967 were some $1,559,000,000 and it ranked tenth in total revenues.[3] Atlantic has large crude oil reserves of 970,849,-000 barrels in the United States. It operates three refineries in this country with a combined capacity of 404,000 barrels per day. It accounts for 3.63% of total domestic refining and ranks tenth among domestic refiners. It also has a 50% interest in a recent crude oil discovery on the Northern Alaskan Slope with reserves estimated at between 5 and 10 billion barrels and estimated production of 600,000 to 900,000 barrels per day.

Atlantic's gasoline marketing operations are presently confined to the Northeastern, Southeastern and Far Western sections of the country.

Sinclair has total assets of some $1,-810,183,000, placing it thirteenth in total assets. Its 1967 total revenues were some $1,500,100,000 and it ranked fifteenth in net earnings with net earnings in 1967 of $95,400,000. It has large crude oil reserves in the United States of 644,017,000 barrels, one-half of which are in Texas. Sinclair operates four refineries in the United States with combined capacity of 450,000 barrels per day. It accounts for 4.04% of domestic refinery capacity and, in 1967, ranked eighth among domestic refiners. It markets gasoline in all of the United States except the Far Western States.

On October 31, 1968, after Gulf and Western Industries had made a tender offer to Sinclair stockholders, Atlantic and Sinclair entered into a merger agreement. The agreement provided that Sinclair would be merged into Atlantic by the exchange of Sinclair stock for Atlantic common and newly issued Atlantic convertible preferred. The merger agreement was approved by the stockholders of both companies on December 31, 1968.

On December 18, 1968, after the merger agreement had been entered into but before it had received stockholder approval, Atlantic entered into an agreement with B P Exploration U.S.A. Inc. (B P) whereby B P agreed to purchase all of the marketing properties of Sin-

---

1. " * * * [N]o corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be subsantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

2. The order to show cause, signed by Judge Herlands after a hearing, contained a ten-day temporary restraining order which I have since extended for two additional ten-day periods.

3. Defendant contends that Atlantic actually ranks fourteenth "if state and federal excise taxes collected from customers are excluded from revenues to be consistent with reports issued by other companies."

clair in the Northeastern United States and its pipelines, storage and distribution terminals, inventories, accounts receivable and patents for the sum of $300,000,000. Also included were the Sinclair refinery in Pennsylvania and the Atlantic refinery in Texas. The sale to B P was to be consummated on the first day of the month following the completion of the merger. The sale was avowedly made by Atlantic for the purpose of avoiding attack on the merger under the antitrust laws because of anti-competitive consequences in the Northeast.

B P is a wholly owned subsidiary of British Petroleum Corporation, Ltd. (B P Ltd.), a United Kingdom corporation which is among the seven largest integrated oil companies in the Western World. It has a net worth of 3.8 billion dollars and gross annual sales of 4 billion dollars. Slightly under 50% of its stock is owned by the British Government. While B P Ltd. has refining and marketing facilities in many parts of the world, it has been unable thus far to enter and compete in the United States market, though it has long desired to do so.

If the purchase agreement is carried out, B P Ltd. will, for the first time, become a competitor in the United States market through its subsidiary B P which has a substantial interest in one of the recent North Alaskan Slope crude oil discoveries. B P anticipates that production from this discovery will eventually fill a large part of its United States crude oil requirements.

Atlantic and Sinclair submitted information and data concerning the proposed merger and the proposed sale to B P of Sinclair assets in the Northeast to the Department of Justice during November and December 1968. Without objection from the Department, Atlantic

made a tender offer to shareholders of Sinclair. Pursuant thereto Atlantic acquired 2,538,369 shares of Sinclair common at a price of $145 per share or a total price of $366,615,505. The merger was scheduled to be consummated on January 20, 1969.

In the meantime, following published rumors that the Department of Justice was planning to challenge the merger, the market price of both Sinclair and Atlantic dropped precipitously from the highs reached when the merger was announced. The total decline in market value of the common stock of both defendants in late December and early January is estimated at $1,100,000,000.

On January 15, 1969, five days prior to the contemplated closing date of the merger, the Department of Justice filed the complaint in this action. The complaint, in substance, charged that, in violation of Section 7 of the Clayton Act, the effect of the proposed merger may be to substantially lessen competition or tend to create a monopoly in the marketing of gasoline in four geographic markets: (1) the Northeastern States,[4] (2) the Rocky Mountain States,[5] (3) the Central States,[6] and the Southeastern States.[7] It alleged that actual and potential competition between defendants in the sale of gasoline will be eliminated, Sinclair will be eliminated as a substantial competitive factor in the sale of gasoline, and competition in the sale of gasoline generally may be substantially lessened.

The complaint seeks judgment declaring that the proposed merger would violate Section 7, and both a preliminary and permanent injunction against carrying out the merger or any similar agreement.

4. The Northeastern States are comprised of Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland and the District of Columbia.

5. The Rocky Mountain States are Idaho, Wyoming, Utah and Colorado.

6. The Central States are Wisconsin, Michigan, Illinois, Indiana, Kentucky, Tennessee, Mississippi and Alabama.

7. The Southeastern States are composed of Virginia, North Carolina, South Carolina, Georgia and Florida.

On the filing of the complaint the Government immediately moved for a preliminary injunction and secured a temporary restraining order against the imminent consummation of the merger. The preliminary injunction motion is before me for decision.

## I

In a series of cases beginning with Brown Shoe Co., Inc. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), and following with such cases as United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), and United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Supreme Court has laid down the basic principles and standards to be used by the courts in applying § 7 of the Clayton Act.

Section 7 proscribes mergers where, as a result, competition in any line of commerce in any section of the country may be substantially lessened. As is clear from Brown Shoe, the section does not prohibit all mergers. While Congress intended to arrest restraints of trade and monopolistic tendencies "in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding,"[8] there is no per se proscription against corporate mergers. The statute is concerned only with those mergers which may have demonstrable and substantial anti-competitive effects.

Moreover, Section 7 was directed neither at the possibility that anti-competitive effects might occur nor at the certainty of such effects.

"[P]roof of a mere *possibility* of a prohibited restraint or tendency to monopoly will not establish the statutory requirement * * *."[9] Section 7 concerns itself with the reasonable probability of the lessening of competition or tendency toward monopoly as a result of the particular merger being scrutinized—a showing that such effects are reasonably likely to occur. This is what the words "may be" as used in Section 7 mean. The lessening of competition must also be shown to be "substantial."

Thus, mergers are proscribed where substantial anti-competitive effects or tendency to monopoly are reasonably probable in *any* line of commerce in *any* section of the country. In order to determine whether there are substantial anti-competitive effects or tendency to monopoly, it is necessary in each case to define the relevant product market in which it is claimed that such effects will occur, and the section or sections of the country affected. The probability of anti-competitive effects and their substantiality cannot be evaluated in a vacuum. They can only be judged in terms of the particular markets affected, that is, "within the area of effective competition."[10]

In the case at bar, at least at this stage of the proceedings, there appears to be no dispute of any substance between the parties as to either the relevant product market or the geographic markets (sections of the country) in which the effects of the proposed merger are to be evaluated. No one now questions that the relevant product market with which this action is concerned is gasoline. Nor is any question raised as to the four sections of the country defined in the complaint as the Northeastern States, the Rocky Mountain States, the Central States and the Southeastern

---

8. S.Rep.No. 1775, 81st Cong., 2d Sess. pp. 4–5 (1950) U.S.Code Congressional Service 1950, p. 4293.

9. United States v. E. I. DuPont de Nemours & Co., 353 U.S. 586, 598, 77 S. Ct. 872, 880, 1 L.Ed.2d 1057 (1957).

10. United States v. E. I. DuPont de Nemours & Co., *supra*, at 593, 77 S.Ct. at 877.

States,[11] which are alleged to be the geographic markets.[12]

Thus, the only substantive issue in dispute, at this early stage of the case, is whether as a result of the merger substantial anti-competitive effects or tendency to monopoly are reasonably probable in the gasoline market in one or more of these four geographic markets.

## II

■ Of course on this motion for a preliminary injunction the ultimate merits of any of the substantive issues are not before me for determination. Indeed, they could not be determined on this limited record.

■ In a Government suit under Section 7, the court is empowered to issue a preliminary injunction when such a "prohibition [is] deemed just in the premises" 15 U.S.C. § 25. One major requirement for preliminary injunctive relief is a demonstration by the Government that it has a reasonable probability of success at trial. See United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3d Cir. 1963); United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 545 (N.D.Ill.1968); United States v. Chrysler Corp., 232 F.Supp. 651, 657 (D.N.D.1964); United States v. Crocker-Anglo National Bank, 223 F.Supp. 849, 850 (N.D.Calif.1963). Unless the Government has established at least this much, its application for preliminary injunctive relief must be denied.

Thus the first question to be determined on the Government's motion is whether it has demonstrated that it has a reasonable probability of ultimate success. Here this question is necessarily confined to the only substantive issue presently in dispute between the parties —whether it is reasonably probable that this merger will result in substantial anti-competitive effects or the tendency

to monopoly in the gasoline market in one or more of the four geographic markets which have thus far been defined.

I turn then to an examination of this question in each of the four geographic markets.

## III

### (a) *The Northeastern States*

In 1967, in the Northeastern States, Atlantic had branded sales of 1,408,439,-000 gallons of gasoline valued at $235,-495,000. Sinclair had branded sales of 832,388,230 gallons valued at $127,702,-991. This gave Atlantic and Sinclair a market percentage of branded gasoline sales in that section of approximately 7.-52% and 4.80% respectively and a combined percentage of 12.32%. In Massachusetts Atlantic accounted for 6.27% of branded gasoline sold while Sinclair accounted for approximately 7.94% for a combined percentage of 14.21%. In Pennsylvania the combined percentage was 24.42% and in Rhode Island 22.97%. On the basis of this substantial overlap the Government contends that it has demonstrated the reasonable probability that it will succeeed in establishing at trial that the merger would violate Section 7.

Were this the complete picture in the Northeast, there might be some merit in the Government's contention. See Brown Shoe Co. v. United States, *supra*; United States v. Von's Grocery Co., *supra*; United States v. Pabst Brewing Co., *supra*.[13] But this is far from the complete picture. It ignores entirely the agreement for the sale by Atlantic of all of the Sinclair assets in the Northeast to B P for $300,-000,000 scheduled to be completed on the first day of the month following the month in which the merger takes effect. The complaint carefully avoids even a mention of this agreement though it was fully known to the Government when the complaint was drawn.

---

11. See footnotes 4, 5, 6 and 7, *supra*, for the states included in each section.

12. That is not to say that, as the case develops, disputes may not arise as to these and numerous other questions.

13. See discussion of these cases *infra*, at pp. 24–28.

The sale of the Sinclair assets to B P would substitute a new and viable competitor for Sinclair in the Northeast. As appeared at the hearing on this motion, there is no doubt that if the sale is made B P will actively and vigorously market gasoline in that area through the extensive Sinclair facilities it has acquired. Backed by its parent, British Petroleum Co. Ltd., it appears to have ample strength and resources to do so. Indeed it is plain that B P and B P Ltd. regard this as an opportunity to enter the American market on a large scale and thus to interject a new and strong competitive factor into that market.

■ Sinclair will completely withdraw from the Northeast. While Atlantic will remain, it will have to compete with B P rather than Sinclair in that area.

The Government takes the curious position that the sale to B P should be completely ignored by the court and that the merger should be treated as if it would result in a combined Atlantic-Sinclair operation in the Northeast. I see no merit in this position. The Government's contention is predicated on several grounds, none of which have substance. First, the Government suggests that since the sale is not to be completed until shortly after the merger has taken effect there is the possibility it may be abandoned, in which event the anti-competitive consequences in the Northeast of a Sinclair-Atlantic combination there would follow. The record does not lend the slightest support to such a speculation. The deferral of the sale until the first of the month following the month in which the merger takes effect appears to be based on quite understandable accounting considerations. Nevertheless, at the hearing Atlantic, Sinclair and B P were entirely willing and indeed eager to make the sale contemporaneous with the closing of the merger if the court considered that of any consequence. In any event it is certainly within the province of the court to approve the merger only if the sale to B P is consummated simultaneously.

The Government also claims that three provisions in the agreement of sale will place B P in such dependence upon Atlantic as to prevent it from becoming a viable independent competitor in the Northeast. The record as it stands at present lends little, if any, support to such a contention.

Payment of the $300,000,000 purchase price is to be made in notes payable in equal annual installments from 1972 through 1978. This scheme of payment appears to be in large measure due to British financial restrictions which make it impossible for the parent company, despite its more than ample resources, to supply the cash in dollars to meet the purchase price immediately. The notes are unsecured and B P is free to mortgage the assets purchased if it so desires. I see no reason to draw the inference that this arrangement will give Atlantic dominance over B P or prevent B P from being a vigorous independent competitor in the Northeast.

Nor does the arrangement whereby Atlantic agrees to meet B P's crude oil needs for a period of three years with an option to B P, but not to Atlantic, to terminate have such an effect. B P anticipates that its crude oil needs will be met eventually from its Northern Alaskan Slope discovery. In the meantime, according to the record before me, B P can take care of its needs by the exchange of B P Ltd. foreign crude for domestically produced crude. The interim arrangement with Atlantic for a three-year supply of domestic crude seems a quite reasonable method of starting off operations and as far as the present record shows has none of the sinister implications ascribed to it by the Government.

The Government also points to a management arrangement whereby Atlantic agrees for a period of one year to maintain and operate the assets purchased as a "viable operating petroleum business." The agreement is terminable on a month's notice by B P, which retains in essence the power to make all decisions of business policy and of

management judgment relating to marketing "including pricing and credit terms to customers." Thus, as appears from the record of the hearing on the motion, the direction of the enterprise is entirely in the hands of B P and the so-called management arrangement is merely a necessary means of effecting the smooth transfer of a very substantial going business.

The three provisions to which the Government objects seem designed to enable B P to become an effective competitive force from the outset of its purchase rather than otherwise.

Finally, the Government seems to take the position that the parties to a merger should not be able to cure possible anti-competitive effects by a sale of a portion of the assets to a third party. No cases are cited to support this position, and I know of none. I see no reason why merging companies cannot eliminate probable anti-competitive effects by such a disposition of assets as will be made here.

Far from establishing that the Government has a reasonable probability of success on its claims of substantial anti-competitive effects in the Northeastern section of the country, the record before me tends to indicate the contrary. For the arrangement viewed as a whole indicates that, instead of competition being eliminated, a new, vigorous and viable competitive force will be substituted for the present competitor.

### (b) The Rocky Mountain and Central States

Sinclair is presently an active marketer of gasoline in both the Rocky Mountain and the Central States. Its share of the Rocky Mountain market in terms of marketed gasoline was 7.2% in 1967. In the Central States market its share ranged from 3.99% in Alabama to 6.88% in Tennessee.

For all practical purposes here, Atlantic does not market in these two areas. Thus, as far as these sections of the country are concerned, this is not a horizontal merger but a geographic market extension merger, which is a species of conglomerate merger. See American Bar Association Antitrust Developments, 1955–68: A - Supplement to the 1955 Report of the Attorney General's National Committee to Study the Antitrust Laws, p. 83; Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1314–15 (1965).

The Government's theory of Section 7 violation resulting from the merger in the Rocky Mountain and Central States is therefore confined to the elimination of Atlantic as a potential competitor in these two areas. See United States v. El Paso National Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775. (1964); F. T. C. v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed. 2d 303 (1967). The evidence relied on by the Government to support this theory is very thin. It relies almost entirely on a series of internal memoranda prepared by Atlantic staff personnel over several years evaluating the relative advantages and disadvantages of merging with other oil companies having a foothold in the Rocky Mountain or Central States.

There is no showing that any negotiations were ever undertaken with any of the companies or even that any discussions on the subject were had with anyone representing them. There is no indication in this record that the Atlantic management gave serious consideration to any such steps. Nor is there any showing that any of the companies which were studied had any interest in merging with Atlantic or are now available for merger.

There is also no showing here that there are any companies in these sections other than those studied available for merger, or that, if there were, the anti-competitive effects of a merger with one or more of them would result in anti-competitive effects less than those resulting from merger with Sinclair. The latter is presumably the theory on which the Government is proceeding in these

areas. All that these memoranda indicate is that Atlantic at various times was not without interest in the possibility of acquiring one or more companies doing business in these areas.

Moreover, there is no evidence in the present record that Atlantic could have entered either the Rocky Mountain or Central States areas by means of internal expansion. It appears without serious contradiction that the cost of internal expansion by a competitor such as Atlantic into these areas would be prohibitive and quite beyond the capital resources which would be required with any hope of reasonable return.

█ Upon this record the Government has wholly failed to demonstrate a reasonable probability of success at trial on the issue of probable anti-competitive effects in these sections of the country as a result of the merger and consequent violation of Section 7. See United States v. Phillips Petroleum Co., 1966 Trade Cases ¶71, 872; United States v. El Paso Natural Gas Co., *supra;* United States v. Penn-Olin Chemical Co., *supra;* F. T. C. v. Proctor & Gamble Co., *supra.*

### (c) *The Southeastern States*

In the five states comprising the Southeastern section of the country Atlantic and Sinclair are substantial marketers of gasoline. In the first nine months of 1968 Atlantic's sales accounted for 2.3% of the Southeast market, while Sinclair's accounted for 5.1%.[14] The combined sales of Atlantic and Sinclair thus amounted to 7.4% of the gasoline sold in the Southeast. During this period Atlantic and Sinclair ranked twelfth and ninth respectively, and their combined ranking would be sixth. The Government contends that the elimination of Sinclair as a competitor through the merger would substantially lessen competition in the gasoline market in the Southeast.

The Government relies on the recent trilogy of horizontal merger cases in which the Supreme Court considered what constitutes probability of substantial lessening of competition.

In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Government sued to enjoin a proposed merger of G. R. Kinney Company, Inc. and Brown Shoe Company on the ground that it would violate § 7. The horizontal aspects of the merger involved the retail shoe outlets of the previously competing firms. In 118 cities [15] the combined market share in one of the relevant lines of commerce [16] was found to exceed 5%. In several other cities the combined percentages ranged as high as 57%. Apparently the markets were diffuse and fragmented, but there had been a pronounced trend in the industry toward concentration.

In holding the merger a violation of § 7 the court said:

"The market share which companies may control by merging is one of the most important factors to be considered when determining the probable effects of the combination on effective competition in the relevant market. * * If a merger achieving 5% control were now approved, we might be required to approve future merger efforts by Brown's competitors seeking similar market shares. The oligopoly Congress sought to avoid would then be furthered and it would be difficult to dissolve the combinations previously approved." 370 U.S. at 343–344, 82 S.Ct. at 1534.

The court also emphasized the industry trend toward concentration and said, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their

---

14. According to Government figures supplied in the complaint, Atlantic and Sinclair branded sales accounted for 2.27% and 4.79% respectively of the gasoline market in the Southeast in 1967.

15. The relevant geographical market was determined to be cities with populations exceeding 10,000.

16. The relevant lines of commerce were found to be men's shoes, women's shoes, and children's shoes.

incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time." Id. at 346, 82 S.Ct. at 1535.

In United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Government challenged the acquisition of Shopping Bag Food Stores by Von's Grocery Company. The product market was retail groceries and the geographic market the Los Angeles area. Von's ranked third while Shopping Bag ranked sixth in retail sales. Combined, the firms ranked second, and their sales were 7.5% of the market. Market trends indicated that single store groceries had sharply declined in number, and that small companies were being absorbed through merger by larger firms. Nevertheless, the market was still diffused among a large number of competing firms.

The purpose of § 7, said the court, was to inhibit economic concentration "by keeping a large number of small competitors in business." Id. at 275, 86 S.Ct. at 1481. In restraining economic concentration Congress empowered courts to "[arrest] a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." Id. at 277, 86 S.Ct. at 1482.

In the last § 7 horizontal merger case to be decided by the Supreme Court, United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Government challenged the acquisition of Blatz Brewing Company by the Pabst Brewing Company. In 1958 Pabst was the tenth largest brewer in the nation; Blatz ranked eighteenth. Combined, the two corporations ranked fifth with 4.49% of the industry's total national sales. In Wisconsin, Pabst and Blatz ranked first and fourth respectively. After the merger Pabst ranked first in Wisconsin with 23.95% of that market. In the three-state area of Wisconsin, Illinois, and Michigan Blatz ranked sixth while Pabst ranked seventh. Com-

bined sales amounted to 11.32% of the total sales in the three-state market.

The brewing industry in all three markets had been characterized by a definite trend toward concentration. In the national market the 10 leading brewers accounted for 52.60% of total sales in 1961, while in 1957 they had accounted for only 45.06%. In Wisconsin in 1961 the four largest brewers accounted for 58.62% of the market. Just four years before they had accounted for 47.-74%. In the three-state area the market shares of the eight leading brewers increased from 58.93% to 67.65%.

In view of the market percentages of the two corporations and the trend toward concentration in the industry, the court found that § 7 had been violated in "each and all" of the three sections of the country, i. e. in the nation as a whole, in the tri-state area and in Wisconsin.

▆▆▆ As has already been indicated, market shares are an important factor in considering the probable effects of a combination on effective competition in the relevant market. Of course such percentages are not the sole criterion.

Among other important factors are industry trends toward concentration, Brown Shoe Co. v. United States, *supra;* United States v. Von's Grocery Co., *supra;* United States v. Pabst Brewing Co., *supra;* the degree of concentration in the industry, Brown Shoe Co. v. United States, 370 U.S. at 322, 82 S.Ct. 1502; United States v. Philadelphia Nat. Bank, 374 U.S. at 365 n. 32, 83 S.Ct. 1715, *supra;* United States v. Aluminum Co. of America, 377 U.S. 271, 279, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964); the history of acquisition of the merging firms, Brown Shoe Co. v. United States, 370 U.S. at 345 n. 72, 82 S.Ct. 1715; United States v. Philadelphia Nat. Bank, 374 U.S. at 331, 83 S.Ct. 1715, and entry barriers in the industry, Brown Shoe Co. v. United States, 370 U.S. at 322, 82 S.Ct. 1715.

These factors must be viewed merely as guidelines in assessing anti-competitive effects which are likely to result from a

merger. They of course cannot substitute for more extensive and detailed analysis at trial of the industry structure and the probable economic effect of the merger in the setting of the particular industry and the relevant geographic market. Brown Shoe Co. v. United States, 370 U.S. at 322 n. 38, 82 S.Ct. 1502. On a motion for preliminary relief such as now before me, detailed economic analysis of this nature is seldom before the court and cannot be expected. The other factors referred to above must therefore be heavily relied on in determining probability of success at trial.

In the case at bar both Atlantic and Sinclair are integrated companies with very large assets. They both wield very substantial economic power.

In the first three quarters of 1968 the four leading marketers accounted for 43.4% of the total sales of gasoline in that section of the country. For the same period the nine leaders sold 74.5% of the total. Thus there is already substantial concentration in the gasoline industry in the Southeast.

Sinclair, ranking ninth, had a market share of 5.1% and Atlantic, ranking twelfth, a market share of 2.3%. Combined, their share of the market would be 7.4% and they would rank sixth in the Southeast. Thus the merger would eliminate a significant competitor in the Southeast and the combined market share as a result of the merger would be substantial.

There have been a number of mergers recently in the gasoline industry generally, as indicated by those between Union Oil Company of California and Pure Oil Company, the Atlantic Oil Company and the Richfield Oil Corporation, Phillips Petroleum Company and the Tidewater Oil Company, and the Sun Oil Company and the Sunray Dx Oil Company. Atlantic has expanded very greatly by merger in the past several years and in fact has almost doubled in size through that process.

Moreover, the gasoline market is characterized by high entry barriers. The nature and size of gasoline marketing operations are such that enormous expenditures of capital would be necessary to enter the market as a viable competitor. Such costs are almost prohibitive.[17]

In view of the high entry barriers, any increase in concentration and decrease in number of competitors by way of merger would be likely to become permanent. Moreover, the absence of potential new entrants into the market, who usually tend to restrain anti-competitive tendencies, enhances any anti-competitive effects which this merger may have.

The combined market shares of the merging companies here would surpass those found in Brown Shoe and Pabst to constitute Section 7 violations and would almost equal those in Von's Grocery. The gasoline industry in the Southeast appears to be more concentrated than the industries in those cases.

Taking these various factors into account, it appears that to permit this merger would run counter to the Congressional purpose of limiting concentration in particular product markets and arresting trends toward concentration in their incipiency. This is particularly true in an industry such as we are concerned with here where the degree of concentration is already substantial. In such an industry the elimination of even a single substantial competitor may have marked anti-competitive effects. Brown Shoe Co. v. United States, supra.

Defendants contend that the Southeast aspects of the merger do not fall within the Department of Justice Merger Guidelines and that therefore the merger should not be prevented from going forward. They point to Guidelines 5 and 6, which indicate that mergers involving

17. With regard to its plans for possible internal expansion into the Central and Rocky Mountain regions, Atlantic has contended that the enormous attendant costs have caused it to abandon any such hopes. Nothing has been presented to show that entry barriers would be any less in the Southeastern section of the country.

market shares and degrees of concentration such as those shown here in the Southeast ordinarily will not be challenged by the Department.[18]

 The purpose of the Guidelines is "to insure that the business community, the legal profession and other interested persons are informed of the Department's policy of enforcing Section 7 of the Clayton Act."[19] However, they are in no way binding on the Department in a particular case and the Department is entitled to evaluate each case on the basis of its own facts and the varied factors that must be taken into consideration. Indeed, the Department has available a business review procedure which, as the Guidelines point out, "make available statements of the Department's present enforcement intentions with regard to particular proposed mergers or acquisitions."[20] The defendants did not avail themselves of the review procedure here.

 In any event, of course, the Guidelines are in no way binding on the courts. In the light of the Supreme Court cases which have been cited and discussed, I am compelled to say that, at this stage of the proceedings, and on this record, the Government has shown a reasonable probability that it will succeed at trial on the issue of probable substantial lessening of competition in the Southeast as a result of the proposed merger.

## IV

Defendants urge that, apart from probability of Government success at trial on the substantive issues, other factors must be taken into account by the court in determining whether a preliminary injunction should issue. They maintain that the overall equities in their favor here are such as to militate strongly against the granting of injunctive relief.

 Defendants point to the fact that if a preliminary injunction is granted, in all likelihood the proposed merger will have to be abandoned. Thus, defendants say, the Government will obtain a complete victory without having to withstand a trial on the merits. They also refer to the over three hundred million dollars which has already been expended by Atlantic in the acquisition of Sinclair stock and the large expenditures thus far made in connection with the merger itself. They point to the possibility of substantial loss to the large number of stockholders of both companies. It is suggested that, in view of the harm to the defendant corporations and their stockholders which it is claimed may result from a preliminary injunction, the merger should be allowed to proceed and that, if the Government should eventually succeed, a decree of divestiture would avert any serious harm to the public interest.

 The factors to which defendants refer cannot be ignored and are entitled to serious consideration. United States v. Phillips Petroleum Co., 1966 Trade Cases § 71,872 at 83,067; United States v. Ingersoll-Rand Co., 320 F.2d

---

18. The relevant Guidelines provide:

"5. *Market Highly Concentrated.*

In a market in which the shares of the four largest firms amount to approximately 75% or more, the Department will ordinarily challenge mergers between firms accounting for, approximately, the following percentages of the market.

| Acquiring Firm | Acquired Firm |
| --- | --- |
| 4% | 4% or more |
| 10% | 2% or more |
| 15% or more | 1% or more |

6. *Market Less Highly Concentrated.*
In a market in which the shares of the four largest firms amount to less than approximately 75%, the Department will ordinarily challenge mergers between

firms accounting for, approximately, the following percentages of the market:

| Acquiring Firm | Acquired Firm |
| --- | --- |
| 5% | 5% or more |
| 10% | 4% or more |
| 15% | 3% or more |
| 20% | 2% or more |
| 25% or more | 1% or more |

The Guidelines also provide a stricter standard in industries characterized by a trend toward concentration.

19. Department of Justice Guidelines, Guideline 1.

20. The first paragraph of the Guidelines states that "The guidelines should not be treated as a substitute for the Department's business review procedures."

509, 523 (3d Cir. 1963). Nevertheless, they cannot outweigh the public interest in preventing this merger from taking effect pending trial. United States v. Chrysler Corporation, 232 F.Supp. 651, 657 (D.N.J.1964). The public interest with which Congress was concerned in enacting Section 7 is paramount.[21]

Divestiture is usually fraught with difficulties and presents a whole range of problems which should be avoided if possible. California v. Federal Power Commission, 369 U.S. 482, 488, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). Such problems seem particularly acute in this case, considering the size of the defendants and the wide range of their operations. The problem may be further complicated by the arrangements with British Petroleum. As the District Court in Ingersoll-Rand aptly said:

> "To permit the acquisitions, even temporarily as defendants insist, would undoubtedly result in the passing of records, trade secrets and other confidential matters into the possession and control of Ingersoll-Rand prior to the Court's final adjudication. * * * Displacement and dislocation of management personnel, assets and records of the acquired companies, together with all other matters which concern the preservation of competitive vigor should be delayed until a decision is rendered at a final hearing." 218 F.Supp. 530, 543 (W.D.Pa.1963), aff'd 320 F.2d 509 (3d Cir. 1963).

■ In view of the finding that the Government has demonstrated reasonable probability of success on the issue of probability of substantial anti-competitive effects of the merger in the South-

east, it has shown sufficient under the circumstances of this case to warrant the issuance of a preliminary injunction. It must be borne in mind that Section 7 is violated if probable anti-competitive effects may occur in "any section of the country." As the Supreme Court said in United States v. Pabst Brewing Company:

> "Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States." 384 U.S. 549–550, 86 S.Ct. 1668.

Accordingly, the Government's showing as to the probability of success on the Southeast issue is sufficient on the substantive question here.

It should be noted, of course, that nothing said in this opinion is to be taken as an attempt to determine finally any aspect of the ultimate merits of this case. The ultimate merits remain fully open for determination at trial.

The Government's motion for a preliminary injunction restraining defendants from carrying out the proposed merger pending the final determination of the action is granted.

This opinion constitutes my findings of fact and conclusions of law on this application pursuant to Rule 52 F.R.Civ.P.

Settle order on five days notice.

---

21. The failure of Congress to require that the Government show irreparable loss on an application for a preliminary injunction in a Section 7 action, as is the case with a private plaintiff, 15 U.S.C. § 26, indicates the Congressional desire to lighten the burden generally imposed on an applicant for preliminary injunctive relief.