**UNITED STATES of America, Plaintiff,**

v.

**CULBRO CORPORATION, Havatampa Corporation, Havatampa Holding Company, and HAV Corporation, Defendants.**

No. 77 Civ. 3149.

United States District Court,
S. D. New York.

Aug. 8, 1977.

John H. Shenefield, Acting Asst. Atty. Gen., Antitrust Div., Dept. of Justice, Washington, D. C., for plaintiff; Alan L. Marx, Steven C. Douse, Henry J. Van Wageningen, Washington, D. C., of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, for Culbro Corp.; John J. Kirby, Jr., Frederick M. Danziger, New York City, Douglas M. Parker, Washington, D. C., Roger A. Stetter, Baton Rouge, La., of counsel.

Greenberg, Traurig, Hoffman, Lipoff, Quentel & Wright, P. A., Miami, Fla., for Havatampa Corp.; Alan T. Dimond, Miami, Fla., of counsel.

Howrey & Simon, Washington, D. C., for Havatampa Holding Co. and HAV Corp.; Richard T. Colman, James R. Fox, Washington, D. C., of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff United States of America ("the government") moves pursuant to Rule 65, Fed.R.Civ.P., to preliminarily enjoin defendants Culbro Corporation ("Culbro"), Havatampa Holding Company ("the Holding Company"), and HAV Corporation ("HAV") from acquiring defendant Havatampa Corporation ("Havatampa") because the acquisition may violate Section 7 of the Clayton Act, 15 U.S.C. § 18. The acquisition had been scheduled to close on July 1, 1977. However, on June 30, 1977 Judge Edward Weinfeld signed a temporary restraining order enjoining the closing for ten days so that relevant legal and factual matters could be developed at a hearing on the preliminary injunction motion. Upon consent of the parties the restraining order was extended under Rule 65, Fed.R.Civ.P., by this Court for an additional ten-day period which expired on July 20, 1977. Prior to the latter date the defendants agreed to voluntarily suspend any action until July 26, 1977 at which time this Court would render its decision. Based upon approximately five days of evidentiary hearings supplemented by extensive briefs, for the reasons hereinafter given, the motion for a preliminary injunction is denied and the parties are directed to submit prior to the closing a hold separate order in accordance with this opinion.

### The Transaction

The proposed transaction calls for Havatampa, a manufacturer and wholesale distributor of cigars and other products, to sell substantially all of its assets, ultimately, to HAV.[1] HAV will then take over operation of the Havatampa business.

HAV is a wholly-owned subsidiary of the Holding Company. The outstanding shares of capital stock of the Holding Company will be closely held by Oppenheimer & Company (65%), and Ira Hechler, a consultant to Oppenheimer and its Director for Special Acquisitions (30%) ("the Oppenheimer interests"); and Bruce Samson, a Florida invest-

---

1. By agreement dated June 2, 1977 Havatampa agreed to transfer substantially all of its assets to HAV in exchange for $40,602,478 cash, of which approximately $32,400,000 constitutes the purchase price and approximately $8,200,000 a loan in anticipation of a tax benefit or refund. As part of the long-term financing for the acquisition, substantially all of Havatampa's fixed assets subsequently will be transferred from HAV to Holding Company. The fixed assets transferred to Holding Company will be security for such financing and will be leased back to HAV for use in HAV's business.

ment consultant (5%). Holding Company and HAV are presently inactive corporations organized by Oppenheimer solely for the purpose of acquiring the business assets of Havatampa.

Oppenheimer is a general partnership engaged directly or through its subsidiary Oppenheimer & Co., Inc., in the brokerage, investment banking and mutual fund management businesses. Beginning in 1976, it commenced acquiring the ownership of businesses. It had acquired three businesses prior to the Havatampa transaction, including a supermarket chain and a manufacturer of women's apparel.

In the summer of 1976 Oppenheimer approached Havatampa seeking to acquire Havatampa's business and assets. Negotiations began and in October of 1976 an agreement in principle was reached and was publicly announced. Thereafter, Oppenheimer, which had used investment "partners" in two of its three prior acquisitions, entered into discussions with two potential co-investing "partners," first with U.S. Tobacco Company, a competing cigar manufacturer, and then with Culbro, a competing cigar manufacturer and wholesale distributor of cigars and other products.[2]

Oppenheimer agreed to take on Culbro as an "investment partner." Manufacturers Hanover Trust Company is to provide most of the financing, having given Oppenheimer a letter of intent for a $50,000,000 loan. Culbro's financial contribution to the financing is relatively small, a $2,750,000 subordinated loan to the Holding Company. However, its financial contribution exceeds that of Oppenheimer which is putting up only $1,785,000.

Moreover, Culbro's interest and participation in the acquisition extends well beyond its financial involvement. Approximately three years prior to this transaction Culbro approached Havatampa for possible acquisition and Culbro approached Oppenheimer in this case. Further, "Culbro officials inquired if . . . Culbro could be of any assistance to Oppenheimer in appraising its proposed acquisition" and "Culbro has assisted Oppenheimer & Co. in evaluating the business operations of the Company, has participated in some of the discussions with respect to the terms of the Sale Transaction and has made suggestions with respect to the relevant agreements." In addition, Culbro will be given an option to purchase up to 25% of the outstanding shares of the Holding Company. It intends to exercise this option at the closing as to the full 25%. According to defendants' counsel this option will cost $330,000 and the amount of Culbro's debentures will be reduced by that amount.[3] Further, Culbro will be given the right to nominate one director to the five-person Board of Directors of the Holding Company; and it intends to exercise this right.[4] Lastly, following the consummation of the transaction, Culbro will be available to give management advice to the Holding Company, HAV, and Oppenheimer regarding the operation of the business now owned by Havatampa.

The significance of Culbro's participation is that it may provide Culbro with the opportunity to control or influence Havatampa's cigar manufacturing and/or cigar wholesale distributing operations. This, in

---

**2.** Mr. Phillips, an Oppenheimer partner who was involved in this and the three prior acquisitions, testified that as to the two prior acquisitions where it used investing partners, in one case the co-investor was not a competitor of the acquired company, and in the other the co-investor was not a direct competitor but was involved in a similar line of business in a different geographic area (acquired company was a retail supermarket which sold many products including drugs. The co-investor was a retail drug store).

**3.** The Court notes the government's objection that the defendants have been somewhat reluc-

tant to document the specifics of the financing. Although defendants have offered a response to this objection, the Court must suggest that unless there is some need for secrecy it would have been preferable to have introduced direct evidence of, for example, the strength of Manufacturers commitment to this transaction and the conditions under which it is prepared to proceed with it.

**4.** It appears that Culbro was also to have the right to nominate one director to the seven member Board of HAV. It is unclear whether this option has been withdrawn.

turn, is significant because Havatampa is the sixth largest manufacturer and the largest wholesale distributor of cigars and other tobacco products in the United States and Culbro is the second largest manufacturer and third largest wholesale distributor. Without going into a necessarily complicated discussion of the merits, suffice it to say that if the Court were to find that there is a reasonable probability of Culbro's exercising control or influence over Havatampa's cigar manufacturing or wholesale distributing operations, then there would be serious and substantial questions as to whether this would reasonably result in horizontal and/or vertical anticompetitive effects.[5]

*Preliminary Injunction Standard*

■ Preliminary injunctive relief is a drastic remedy under any circumstance, to be granted only when it is equitable to do so. For this reason, the party seeking such relief must satisfy a stringent standard. In the usual case the standard is that the movant must make a clear showing of either (1) possible irreparable harm and probable success on the merits; or (2) sufficiently serious questions which present a fair ground for litigation and the balance of hardships tipping decidedly in its favor. *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973). Although it may not be apparent on the face of the Sonesta test, the law is clear that irreparable harm is required under both prongs of that test; it is subsumed under the balance of hardship portion of the second prong. *Triebwasser & Katz v. AT&T,* 535 F.2d 1356, 1359 (2d Cir. 1976);

accord, *New York v. Nuclear Regulatory Commission,* 550 F.2d 745 (2d Cir. 1977); *Jacobson & Co. v. Armstrong,* 548 F.2d 438, 441 n.3 (2d Cir. 1977). This follows from the fact that "[i]f the element of irreparable damage is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success as to the merits, need for proof of the threat of irreparable damage is even more pronounced." *Triebwasser, supra* at 1359.

■ In government Clayton Act suits, however, the standard appears to be a little different, with more emphasis on probability of success and less emphasis on irreparable harm. As to probability of success, "[P]roof of a mere *possibility* of a prohibited restraint or tendency to monopoly will not establish the statutory requirement * * *." Section 7 concerns itself with the reasonable probability of the lessening of competition or tendency toward monopoly as a result of the particular merger being scrutinized—a showing that such effects are reasonably likely to occur. This is what the words "may be" as used in Section 7 mean. The lessening of competition must also be shown to be "substantial."

*United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1066 (S.D.N.Y.1969) (footnote omitted, emphasis in original, *citing United States v. E. I. Du Pont de Nemours & Co.,* 353 U.S. 586, 598, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957)); *accord, United States v. G. Heileman Brewing Co.,* 345 F.Supp. 117, 119 (E.D.Mich.1972); *United States v. IT&T,*

5. On the particular facts of this case the grant or denial of the preliminary relief sought largely turns on whether there is an alternative, less drastic, preliminary remedy which will provide adequate interim relief and ensure adequate permanent relief if a violation is ultimately found. Accordingly, there is no need for this Court to engage in an extended discussion of the probabilities of ultimate success on the merits, especially since this case is presently assigned to another judge of this Court for trial. If the case is tried by Judge Weinfeld, this Court's tentative views on the merits might be irrelevant. On the other hand, the Court

recognizes that the defendants' decision on whether to consummate the acquisition in the face of possible divestiture of the Culbro interest may be predicated on their perception of their chances of ultimate success on the merits. See letter from William H. Barrett, Jr. to Alan Marx, July 19, 1977. Under these circumstances, it would not be fair to hold the parties completely in suspense. For this reason, it is hoped that this opinion, although not directed at success on the merits, will provide some indication of this particular Court's tentative views on some of the issues.

306 F.Supp. 766, 774 (D.Conn.1969), *appeal dismissed*, 404 U.S. 801, 92 S.Ct. 20, 30 L.Ed.2d 34 (1972).

As to irreparable harm, there is a line of cases which holds that once reasonable probability of success is shown, irreparable harm should be presumed. This is because

> [t]he enactment into law of [section] 7 was an expression of the public policy of the nation, and the threatened violation of the law here is itself sufficient public injury to justify the requested relief. The Congressional pronouncement in § 7 embodies the irreparable injury of violations of its provisions. No further showing need be made by those directed to enforce that section than that it is being violated or threatened with violation.

*United States v. Ingersoll-Rand Co.*, 218 F.Supp. 530, 543–44 (W.D.Pa.), *aff'd*, 320 F.2d 509 (3d Cir. 1963); *accord, United States v. Atlantic Richfield Co.*, *supra* at 1074 n. 21; *United States v. Pennzoil*, 252 F.Supp. 962, 986 (D.Pa.1965); *United States v. Chrysler Corp.*, 232 F.Supp. 651, 657 (D.N.J.1964).

■ The Court, recognizing that § 7 is designed to prevent incipient, rather than present, anticompetitive effects, accepts this proposition that irreparable harm should be presumed once a reasonable probability of anticompetitive effects has been demonstrated. However, proof of reasonable probability of success and the presumption of irreparable harm do not relieve a court of equity of its duty to balance the hardships,

> [f]or traditional equitable principles apply in any request for injunctive relief. [Therefore] in addition to considering the probability that a full hearing would establish a violation, the court must consider the relative injury to the parties, the industry, and the public that may or may not result from the issuance of a preliminary injunction.

*United States v. G. Heileman Brewing Co.*, *supra* at 121. This is the law in this Circuit. *Gulf & Western Industries v. Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 693 (2d Cir. 1973); *United States v. IT&T*, *supra* at 797 n. 95.

As to the balance of hardships, the government asserts that this almost always tips in the government's favor, and does so here, because injury to the private parties must be subordinated to the presumed injury (if any) which the private parties' transaction would cause the public. To tip the scales the other way, evidence of injury to the private parties

> must be so proportionately persuasive as to submerge the principle that "the status of public interest and not the requirements of private litigation measure the propriety and need for relief."

*United States v. Pennzoil*, *supra* at 986 (dicta).

■ The Court recognizes that to effectuate § 7, the statute's prophylactic purpose of preventing threatened future harm must outweigh the harm the injunction will cause the individual parties, *if* there is a reasonable threat of the anticompetitive harm occurring. The question, then, is whether there is a reasonable prospect of that harm occurring. The answer depends not only upon the government's proof on the merits, but also upon whether other prophylactic measures can be taken to obviate this threat. This breaks down into four inquiries which the Court must address in determining the propriety and equity of granting or denying the interim relief sought by the government:

1. Has the government demonstrated a reasonable probability that a substantial lessening of competition will occur during the pendency of this action and prior to entry of permanent relief in the event a violation is proven?

2. If so, is there an effective but less drastic preliminary remedy, such as a hold separate order, which will prevent this probable interim harm to the public?

3. Correlative to Question 2 above, will the entry of a hold separate order instead of a preliminary injunction against the acquisition ensure speedy entry of effective permanent relief if a violation is found?

4. If so, in this case, is there in fact a threatened injury to the public which outweighs the injuries to the private parties?

## I. No Reasonable Probability of Interim Harm to the Public

■ The Court concludes that the government has failed to establish a reasonable probability of interim harm to the public. The Court believes that this case can be tried and a decision can be rendered within a reasonably short period of time, which would substantially reduce the opportunity for Havatampa and Culbro to engage in anticompetitive conduct which might later harm the public. The question is whether it is nonetheless reasonably probable that harm will occur during the relatively brief interim. The proof adduced on this subject was the opinion of competitors that over the course of time, over a period of years, as opposed to in the near future, the acquisition might have an impact on their businesses.[6] Thus, the proof fails to support the contention that it is reasonably probable that harm will occur in the interim. Moreover, these opinions were based on the supposition that the consummated transaction basically would be that which had been originally planned. They did not account for the additional conditions this Court is imposing on the transaction. Therefore, even if this opinion testimony supported the contention that it is reasonably probable that harm will occur in the interim, it would be entitled to only limited weight because it is not based on all the facts.

Furthermore, apart from the evidence introduced on this question, the Court believes it is inherently improbable that Havatampa and Culbro will take any anticompetitive actions when they are being closely scrutinized by the government and this Court. It would be completely contrary to their interests for them to do anything which would assist the government in proving this case, which would not only ruin this deal but would also provide the foundation for private antitrust suits against them.[7]

While defendants must refrain from taking anticompetitive actions so as not to undermine their case, such self-restraint will do nothing to advance their case. This is because post-acquisition evidence which is unfavorable to the defendants would be entitled to great weight since it clearly would not be contrived, see, e. g., United States v. E. I. Du Pont de Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957), but post-acquisition evidence favorable to the defendants, such as the absence of interim anticompetitive actions or effects here, would be entitled to no weight because of the likelihood that it would be contrived. See FTC v. Consolidated Foods Corp., 380 U.S. 592, 598, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965); cf. United States v. General Dynamics Corp., 415 U.S. 486, 504–06, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974).

For the foregoing reasons it is highly improbable that Havatampa and Culbro will take any actions which might cause interim harm to the public.

6. Mr. Smith of John F. Swisher & Sons, Inc. testified that he "feared" that there would be anticompetitive effects on Havatampa's wholesale distribution of Swisher cigars "over a period of time, whether that be one year, five years, or even longer." Mr. Gfeller of Consolidated Cigar Corporation testified that in his opinion Culbro's participation in the transaction would "over a period of time" hurt Consolidated's business.

7. The government urges that it might be difficult to detect and prove that anticompetitive actions and effects did occur during the interim. The Court accepts that future harm, which § 7 is intended to prevent, is not susceptible to direct proof, but rather must be inferred from proof of certain accepted indicia. However,

when it comes to the existence or nonexistence of past and present acts and present effects there is no reason why the government should be any less adept than private antitrust litigants in mustering proof. Nonetheless, there may be cases where to effectuate the policy of § 7 it would be appropriate to grant a preliminary injunction to avoid later difficulties in proving damages which are likely to occur in the interim. But that is not to say that the policy of § 7 requires or justifies preliminarily enjoining all acquisitions, no matter how slim the possibility of interim harm, just because the government, like every private litigant, may experience some difficulty proving causation and damage.

As to the interim harm which could result from actions taken by defendants' competitors if this transaction is not preliminarily enjoined, no competitor-witness testified that it would take any immediate steps to acquire a competitor or forwardly integrate. Some of the witnesses said that they "would have to consider" making an acquisition, not that they had any serious plans of doing so. On this point the Court relies heavily on the testimony of Alexander Brainard. Mr. Brainard, President of Consolidated Cigar Corporation, by far the largest cigar manufacturer, was one of the government's most credible witnesses. In response to the question of whether "Consolidated [has] considered what it would do in terms of adding other distributors in the Havatampa area if this acquisition is consummated" he replied "As a result of the acquisition or merger, there will be nothing done." In response to the question whether what he was saying was "if the acquisition goes through you will continue to leave in place where it now exists the exclusive franchise you have conferred upon Havatampa, and until and unless you see your products are not being distributed with the same vigor or what other adjectives we wish to use, you will leave that in place. If it falls off you will add other distributors as the case may be?", he replied "Correct." The clear implication of this testimony is that Consolidated not only has no immediate plans of adding or changing distributors, but also has no immediate plans of making an acquisition or forwardly integrating. Thus, the testimony in the record does not support the contention that during the interim there will be any increase in concentration or integration as a consequence of this acquisition. Furthermore, the existence of this suit, the preliminary relief that will be ordered and the prospect of possible divestiture make it improbable that the competitors, some of whom had refrained from such acquisitions in part because of fear of antitrust litigation, will take any action in the interim. Moreover, the evidence that major competitors of Culbro and Havatampa have recently given up their own distributing operations because a variety of factors have made it more profitable to distribute through full-line product distributors also undercuts the contentions that there is a trend toward integration or concentration on the wholesale level and that this trend will be advanced by the denial of a preliminary injunction.

Thirdly, the government maintains, in effect, that even apart from any post acquisition anticompetitive conduct of Culbro or Havatampa, and apart from any defensive acquisitions or integration their competitors may subsequently undertake, this acquisition will be anticompetitive because it will increase barriers to entry in that new entrants will have to come into the market already integrated. There are two problems with this position. First, it assumes that the consummation of this acquisition will stimulate the larger competitors to embark on a campaign of acquisitions or integration in the near future. As the Court just indicated, the record does not bear out this assumption.

The second difficulty with this position is that in this case increased barriers to entry would appear to be irrelevant on the manufacturing level. This tentative opinion is based on the government's concession that there are already substantial barriers to entry on the manufacturing level. The net result of these barriers and the stipulated increasing unprofitability and excess capacity of the cigar industry is that in all likelihood there are no potential entrants anyway. This is borne out by the evidence that more and more cigar manufacturers have gone out of the business, and not because they have been driven out by the giants or by a trend toward integration and/or concentration. Rather, the reverse is true, namely, that the trend toward concentration and alleged trend toward integration have resulted from the voluntary departure of manufacturers who left because there is no longer enough money to be made. Thus, on the manufacturing level, since there does not appear to be any prospect of potential entrants, any increase in already existing barriers to entry would appear to be inconsequential.

On the wholesale distribution level, in view of the evidence as to the number of distributors in the country (2000 to 3500), it appears that wholesaling is a fragmented, not a concentrated, industry. The government suggests, however, that more successful distributors such as Havatampa and Culbro have achieved their dominance on the one hand by virtue of their disproportionate size, which permits them to service more outlets and to offer single vend service, and on the other hand, by virtue of cost savings resulting from their being backwardly integrated with a cigar manufacturer. The government emphasizes that Culbro was able to enter only by acquisition and Havatampa and Culbro, the only two integrated companies in the business, achieved their size and diversification, and in turn, their dominance by virtue of acquisitions. Thus, the government contends, entry and expansion in wholesale distribution effectively is possible only through acquisition or forward integration, which is a barrier to entry; and this barrier will be raised even higher by allowing two giants to enter into a relationship whereby they may collude rather than compete. At this juncture, the Court is not prepared to address the question of whether this acquisition will increase barriers to entry on the wholesale level. However, it is not necessary to do so because the Court addresses the threat of collusion elsewhere and has already noted the government's failure to prove that it is reasonably probable that prior to entry of final judgment in this suit there may be acquisitions or integration of other cigar manufacturers which would increase integration and, in turn, barriers to entry and thereby tend to substantially lessen competition. As to the possible reactions of other wholesale distributors and the effect of those possible reactions on concentration and competition, the Court is left to surmise, for the government did not call any competing wholesalers to testify.

The potential horizontal anticompetitive effects of this transaction, apart from the previously discussed projections of increased concentration, integration and barriers to entry, are unclear. Although it is true that many horizontal violations have been found on the basis of market shares and concentration alone, e. g., *United States v. Von's Grocery Co.*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), it is also true that when the Supreme Court laid the ground work for § 7 suits it stated that a functional analysis, not simply a statistical analysis, must be employed. *Brown Shoe Co. v. United States*, 370 U.S. 294, 322 n.38, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In *General Dynamics, supra*, 415 U.S. at 494–98, 94 S.Ct. 1186, the Supreme Court recently reaffirmed, both in word and practice, this principle which until *General Dynamics* had been observed more often in the breach. A functional analysis would appear essential in this case in any event, given the decline in cigar manufacturing, the trend toward single vend in wholesaling, and the fact that this acquisition is not a merger and therefore will not result in the disappearance of Havatampa. Accordingly, the Court feels constrained to examine the probabilities of there being other more concrete anticompetitive effects.

An effect feared by Mr. Brainard of Consolidated is that Havatampa and Culbro might combine their assets and operations and thereby obtain cost efficiencies which would enable them to cut prices and undersell Consolidated. However, Mr. Phillips of Oppenheimer testified that Oppenheimer anticipated that the assets and operations of Havatampa and Culbro would remain intact and separate. To eliminate any doubt on this subject, the Court will make this one of the hold separate conditions for denying the preliminary injunction.

Since Havatampa and Culbro will continue to operate as separate entities, it is clear that Havatampa will not be eliminated as a competitor. Thus, there will not be the loss of one competitor and concomitant increase in market share of another competitor as classically results when one company is merged into another. Nor will there be the situation which the government expert assumed would exist, namely, an increased

opportunity for price collusion or oligopolistic pricing *due to the absence of one less competitor* from whom it would have been necessary to obtain approval or acquiescence.

It is apparent that what the government fears on the horizontal level is the opportunity for exchange of information between competitors. In its reply brief the government raised for the first time the threat of price fixing between the two companies. There was no proof of this. The government expert testified on a different theory: the theoretical opportunity for, as opposed to an actual threat of, price fixing or price leadership in the cigar industry in general, as distinct from between Culbro and Havatampa in particular. In testifying as to this theory the expert's opinion was not based on any evidence in the record to suggest that there has ever been oligopolistic pricing in the cigar industry. On the contrary, there had been testimony that the cigar industry, though unprofitable, is more competitive than ever. Further, there was uncontroverted direct testimony from Mr. Regensburg of Bayuk Cigar Company, a highly credible government witness, that cigar prices are elastic in one direction, meaning that when the price of cigars goes up, demand for cigars goes down correspondingly, but when the price of cigars goes down, demand does not go up measurably. Thus, the evidence in the record concerning competition and elasticity of prices in the cigar industry, as well as the absence of evidence concerning past or present collusion and/or oligopolistic pricing in the industry, contradicts the government expert's theory on the possible impact this transaction might have on pricing in the cigar industry generally. It also undercuts the government's last minute assertion that it feared price fixing between Culbro and Havatampa.

Based on the foregoing, the Court concludes that the government has failed to establish a reasonable probability of interim harm to the public.

## II. *Even if There Were a Reasonable Probability of Interim Harm to the Public, a Hold Separate Order Would Obviate any Interim Effects*

In suggesting that an agreement between Culbro and Havatampa to fix prices is not reasonably probable on this record, the Court does not overlook the opportunity for dissemination of other sensitive data. In fact, the Court regards this as perhaps the most probable concrete horizontal anticompetitive effect.

Thus, the threat of horizontal effects arises from the interchange between Havatampa and Culbro which this transaction may permit. Similarly, the threat of vertical effects as a result of Culbro's projected influence over Havatampa management depends upon the opportunity for interchange between the two companies and between Culbro and Oppenheimer. These are serious and substantial questions to be resolved after a full trial on the merits. At this point, however, the Court is of the opinion that the threat of interchange and influence during the period between acquisition and final judgment is substantially diminished by specific safeguards incorporated in the acquisition agreement, further concessions made by the defendants, and additional precautions to be ordered by this Court.

First, there is a long term management agreement whereby the current Havatampa management, with which the industry is by and large satisfied, will continue to run Havatampa for 15 years. Included in that agreement is a provision for management bonuses which are related to Havatampa's profitability. Thus, management has an incentive to maximize Havatampa's profits. In contrast, the Havatampa management will not have stock options in Culbro or any other monetary incentive to favor Culbro at the expense of Havatampa.[8] There is also a provision in the Management Agreement

8. The Court is aware, of course, that advancing Culbro's interest and maximizing Havatampa's profits need not necessarily be mutually exclusive goals, although defendants have attempted to persuade the Court otherwise. On the other hand, the Court is not prepared at this juncture to accept the government's contention that Havatampa can favor Culbro to the extent of "substantially lessening competition" without thereby impairing Havatampa's profitability.

which allows or its termination if for two consecutive years Havatampa does not maintain a specified level of profits, a level which it has been able to maintain in the past and which Mr. Carlton believes can be achieved in the future despite a recent decline in earnings. Inasmuch as there is no reason to believe that this action will not be finally determined within two years, there is no real threat of Havatampa management's being terminated in the interim.[9]

Second, any interchange or influence which may have been facilitated by Culbro's nomination of a director to either the HAV or the Holding Company Board of Directors, or both, has been completely obviated. At the outset of the litigation, Culbro withdrew its nomination of Edgar Cullman, President and Chairman of the Board of Culbro.[10] Subsequently, it agreed to forego nominating any Culbro director to either Board, leaving all nominations to Oppenheimer during the pendency of this action. This concession will be incorporated in the hold separate order.

This in itself, while helpful, does not eliminate the threat of interchange between Culbro and Havatampa, and the threat of Culbro influence over Havatampa and Oppenheimer. Mr. Phillips of Oppenheimer, a highly credible witness, testified that Oppenheimer planned to adhere to its firm and successful policy of not interfering in the internal management of its acquired companies, all of which are presently run by strong management teams under bonus incentive plans which are tied to profits, as in this case. He cited examples of his refusals to interfere with the internal management of the acquired companies even though it

would have been to Oppenheimer's advantage for him to have interfered.[11] He then concluded that if he had not interfered when he had had an incentive to do so, he certainly had no intention of interfering just because it might be to the advantage of Culbro, a minority partner in this transaction and one who had no financial interest in Oppenheimer. Notwithstanding this avowed intention, however, Mr. Phillips also testified that Oppenheimer required Culbro's participation in this transaction in part because Culbro could provide advice on a wide variety of matters including distribution. This advisory role was deemed critical, despite the existence of a Management Agreement under which the present, experienced Havatampa management would continue to run the day-to-day affairs of the company, apparently because Havatampa's earnings had fallen off and it was feared that this might have been the result of weak management. Mr. Phillips explained that the means of obtaining this advice would not be simply through the Culbro director, but by direct access to whichever Culbro executives happened to be knowledgeable on a particular subject.

The substance of Mr. Phillips' testimony is that Culbro is not just a minority investor; Culbro is a consultant, and a consultant whose opinion will be afforded extra weight because Culbro has a financial stake in its opinion being correct. From this the Court infers that the Havatampa management, though in control, would not be free from Culbro influence. At this point, however, the Court is not prepared to decide whether it is reasonably probable that this anticipated influence may be of such a na-

---

9. The government hypothesizes that Mr. Carlton, who is presently Chairman of the Board, Chief Executive Officer and President of Havatampa and will continue as President and Chief Executive Officer under the Management Agreement, may retire or simply abdicate his authority. Although Mr. Carlton admits to owning a ranch to which he hopes to devote more time, he unequivocally denies having either intention. Even if his denial were disingenuous this would not necessarily lead to the immediate or eventual dismemberment of the Havatampa management team. The Court

does not accept the government's invitation to speculate on this matter.

10. Mr. Cullman's name was withdrawn at the outset of this suit to obviate a potential § 8 violation, 15 U.S.C. § 19. The § 8 claim, accordingly, was dismissed.

11. Although Mr. Phillips may not have directly interfered, he did assist the parties who sought out his influence by making potentially helpful introductions to the presidents of the companies involved.

ture and extent that it may tend to substantially lessen competition in a relevant product within a relevant geographic market.[12] Rather, the Court has concluded that the status quo can reasonably be maintained by a hold separate order which would include *inter alia* that the following conditions be observed until entry of final judgment:

1. Havatampa's and Culbro's assets and operations shall be kept intact and separate;

2. Culbro is not to interfere with or participate in Havatampa's management or internal affairs and it shall refrain from giving any advice to Oppenheimer or Havatampa with respect to cigar manufacturing and cigar distribution;

3. Culbro shall forego nominating or having any input into the selection of any directors of HAV or Holding Company;

4. No member of the Havatampa management team, as that team is defined in Stipulation of Fact 43, shall be discharged except for good cause shown, and prior to final judgment the team itself shall not be terminated for any reason including failure to maintain the level of profits prescribed by the Management Agreement. In all other respects the Management Agreement shall remain in force;

5. Culbro shall not have access to or obtain any of Havatampa's customer lists, trade secrets, price lists or other confidential, competitively sensitive information, nor shall Culbro provide Havatampa with any such similar Culbro information or with access thereto;

6. Culbro shall not obtain any interest in Holding Company or HAV beyond the 25% interest it plans to acquire in Holding Company and the subordinated debentures in the amount of $2,750,000. The Oppenheimer interests shall not dispose of any of their 70% interest in Holding Company;

7. Oppenheimer shall not enter into any agreement with Manufacturers Hanover Trust which would encumber or frustrate any aspect of the hold separate order.[13]

### III. *Entry of the Hold Separate Order Will Ensure Speedy, Complete and Effective Divestiture if a Violation is Found*

The Court recognizes that if there would be a reasonable probability of interim public harm and/or difficulties in untangling the transaction once it has been consummated then divestiture would not provide complete relief and a preliminary injunction would be in order. The Court has already concluded that the government has not proven a reasonable probability of interim public harm and even if it had, the specific structure of this transaction lends itself to an effective hold separate order. Therefore, the Court now turns to whether the structure of this transaction and the entry of the hold separate order will ensure quick, complete and effective divestiture if a violation is found.

On this issue the government relies on broad language from cases and commentaries regarding the inadequacy of divestiture in many cases. As with the interim harm issue, the government makes no effort to demonstrate the applicability of these broad principles to the facts of this case.

For example, the government relies on *United States v. Atlantic Richfield, supra,* where the court stated at 1073–74:

> Divestiture is *usually* fraught with difficulties and presents a whole range of problems which should be avoided if possible. . . . Such problems seem particularly acute in *this* case, considering the size of the defendants and the wide range of their operations. The problem may be further complicated by the arrangements with British Petroleum. (Emphasis added) (citation omitted).

The factors that were peculiar to that case were that it involved a merger, not a particular stock acquisition, of two major corpo-

---

**12.** There are too many questions which cannot be confidently resolved, such as the one referred to in note 8 *supra.*

**13.** An additional condition is imposed *infra* in the discussion on divestiture.

rations. Furthermore, the assets of the merged company were to be sold to a third party (British Petroleum) by the acquiring company. Thus, divestiture would not have been an alternative to a preliminary injunction because the merger would have resulted in entanglement of operations and depletion of assets. *See also United States v. Pennzoil*, 252 F.Supp. 962 (D.Pa.1965) (merger).

Similarly, another case heavily relied upon by the government is *United States v. Ingersoll-Rand Co.*, 218 F.Supp. 530 (W.D. Pa.), *aff'd*, 320 F.2d 509 (3d Cir. 1963). That case involved three acquisitions: (1) an asset acquisition whereby the company selling its assets would not be permitted to use its name in the future in connection with any related business; (2) an asset acquisition whereby a wholly-owned subsidiary of the defendant would acquire all of the property of another company in exchange for voting stock of the defendant and within twelve months thereafter the company selling its property would dissolve and distribute the defendant's stock to its shareholders; (3) a stock acquisition whereby the defendant would purchase all of the issued and outstanding stock of another company, all of whose officers and directors would thereupon resign, in exchange for common stock of the defendant. Understandably, the court found that "complete reconstruction has been planned in the proposed acquisitions by which Ingersoll-Rand will integrate [*i. e.* merge] the other three defendant companies." *Id.* at 543.

In contrast to *Atlantic Richfield, Pennzoil*, and *Ingersoll-Rand*, this Court is not faced with a potential commingling of assets and operations which would later have to be untangled if divestiture were ordered; nor will Havatampa's identity forever be lost, or its property disposed of if the transaction is consummated now. Unlike the cases relied upon by the government, this transaction is extremely well-defined and will be overseen by Court order. For this reason, the government's broad quotes concerning the inadequacy of divestiture are inapposite.

The only question remaining is how quickly the divestiture of the Culbro interest—the only interest which concerns the government—if ordered, could be accomplished. Any feared difficulties in this respect have been completely eliminated by the defendants' assurance that Culbro's 25% equity interest can be disposed of within a brief period, not to exceed 120 days after the entry of a final judgment of divestiture. Further, defendants have agreed that if no outside buyer can be found in time, Holding Company will buy back the 25% interest within the prescribed time period. With the addition of this condition to the hold separate order, there can be no doubt that divestiture, if necessary, can be accomplished quickly, completely and effectively.

## IV. *Accordingly, the Balance of Hardships Favors the Private Parties*

Oppenheimer, Culbro and Havatampa have a stake in this transaction which could be jeopardized by the entry of a preliminary injunction. For purposes of balancing the hardships, however, the Court will consider only the injury to Havatampa which might result if the preliminary injunction were granted.

First, Mr. Carlton, President of Havatampa, testified that Havatampa had expended approximately $500,000 in preparation for the closing. If the closing is postponed many of these costs will be re-incurred.

Further, the defendants urge that there is a substantial risk that the transaction will fall through if the preliminary injunction is granted. Manufacturers Hanover Trust has not made a binding commitment to provide the $50,000,000 in long-term loans and its commitment, according to Mr. Phillips of Oppenheimer, appears to be contingent upon Culbro's participation in the transaction.[14] If Culbro's participation were enjoined indefinitely, it is reasonable to suspect that Manufacturers Hanover Trust would be inclined to lend its money elsewhere. The defendants claim that this

---

14. See note 3 *supra*.

will abort this transaction, which would mean that the approximately $500,000 expended in preparation for the closing would be lost.

The end of this transaction would also mean that the 2300 or so Havatampa shareholders would lose the opportunity to sell their shares back to Havatampa for $13.25 per share to be paid in cash or to be reinvested in Havatampa which at that point will have become an investment company. This $13.25 per share represents a substantial premium of approximately $3.00 per share over the price at which Havatampa common stock had been trading prior to the announcement of this transaction.[15] Mr. Carlton testified that if the transaction is not consummated the shareholders will suffer additional damage in that they will have lost the opportunity to re-invest the $13.25 either in Havatampa or elsewhere at a substantially higher rate of return (perhaps as high as 65 to 70 cents per share) than the shareholders are currently receiving in dividends (44 cents per share). He also stated that Havatampa did not have any plans of increasing its dividends in the foreseeable future if this transaction did not close.

In the same vein, Mr. Levine of Reynolds & Company, which performed a fairness evaluation of this transaction, testified that this acquisition "was not only fair to the shareholders of Havatampa but extremely favorable for them." [16]

The government contends that though this opportunity may be lost, there is no reason to believe that other opportunities will not come along. For example, the government points out that in 1976 when the negotiations with Oppenheimer temporarily broke down, Havatampa had considered making a tender offer to some of its shareholders at $13.00 per share. In this regard, the Court hesitates to attach much weight to Mr. Carlton's assertion that there are no foreseeable opportunities, including no prospect of a tender offer or an increase in dividends. However, the Court does find credible the testimony of Mr. Levine of Reynolds that from August 1975 to August 1976 on Havatampa's behalf Reynolds had communicated with 30 major corporations on a formal basis to ascertain if any of them would be interested in acquiring Havatampa. None of those overtures ever got to even the negotiation stage. Since that time Havatampa's attractiveness as a candidate for acquisition has probably decreased, in view of Havatampa's decline in earnings and the threat of litigation which must be even greater now that this suit has been brought.

Based on the foregoing, the Court concludes that there is a serious risk that granting the injunction would abort the financing, which would put an end to the transaction. As a result, Havatampa would lose the monies it has already expended and its shareholders will lose a good opportunity which might have no counterpart on the immediate horizon. These "factors to which defendants refer cannot be ignored and are entitled to serious consideration." *United States v. Atlantic Richfield*, 297 F.Supp. at 1073.

Another factor the Court can consider is the government's delay in bringing suit. *See United States v. Aluminum Co. of America*, 1960 Trade Cas. ¶ 69,727 (N.D.N.

---

**15.** The high and low bid prices for Havatampa Common Stock in the over-the-counter market for the years 1975 and 1976 were as follows:

| | Bid | |
|---|---|---|
| | High | Low |
| **1975** | | |
| First Quarter | $8¾ | $6¼ |
| Second Quarter | 9⅞ | 7½ |
| Third Quarter | 10 | 7 |
| Fourth Quarter | 7¾ | 6⅞ |
| **1976** | | |
| First Quarter | 8¾ | 7⅜ |
| Second Quarter | 9½ | 7¾ |
| Third Quarter | 10⅜ | 9⅝ |
| Fourth Quarter (through October 13) | 10⅜ | 9⅝ |
| Fourth Quarter (from October 14) | 11¾ | 10½ |

**16.** The Court notes that part of Reynolds' compensation for performing the fairness evaluation is contingent upon the closing actually taking place.

Y.1960); *cf. Ingersoll-Rand, supra,* 218 F.Supp. at 534. Here, the Oppenheimer-Havatampa transaction was publicly announced in October 1976 and Culbro's participation has been known to the government since at least April 1977. Presumably the government needed the two months or so to prepare this action, which was brought on by order to show cause on June 30, 1977, the day before the closing was to take place. Whatever the reason for the delay, it would clearly result in a hardship to Havatampa, a hardship which it need not be made to suffer, in view of the lack of reasonable probability of interim public harm, the adequacy of a hold separate order, and ease of divestiture, if ultimately ordered. For these reasons, the government's motion for a preliminary injunction is denied.

Before the closing is consummated, the parties shall meet and agree upon a hold separate order incorporating *inter alia* the conditions outlined in this opinion.

It is so ordered.

### ADDENDUM

Subsequent to the Court's rendering of its decision on July 26, 1977, the parties met and agreed upon the following hold separate order:

Pending a trial on the merits and until entry of a final judgment, IT IS HEREBY ORDERED AND DECREED AS FOLLOWS:

1. Havatampa's assets and operations shall be kept intact and separate from Culbro's assets and operations.

2. Culbro is not to interfere with or participate in the management or internal affairs of Havatampa, HAV or Holding Company, and it shall refrain from giving any advice to Oppenheimer, Havatampa, HAV or Holding Company relating to the manufacture or distribution of cigars.

3. Culbro shall forego nominating or having any input into the selection of any directors of HAV or Holding Company. No present or former employee or director of Culbro shall be appointed as a director of HAV or Holding Company, nor shall any person be appointed as a director of HAV or Holding Company to represent directly or indirectly the interests of Culbro.

4. No member of the Havatampa management team, as that team is defined in Stipulation of Fact 43, shall be discharged except for good cause shown, and prior to final judgment the team itself shall not be terminated for any reason including failure to maintain the level of profits prescribed by the Management Agreement. In all other respects the Management Agreement shall remain in force.

5. Culbro shall not have access to or obtain any of Havatampa's customer lists, trade secrets, price lists or other confidential, competitively sensitive information, nor shall Culbro provide Oppenheimer, Havatampa, HAV or Holding Company with any such similar Culbro information or with access thereto; provided, however, that nothing contained in this provision or any other provision of this Order shall be construed to prohibit Culbro, Havatampa, HAV, or Holding Company from continuing to operate in the normal course of their present business relationships or to inhibit Culbro from advising Oppenheimer or the other defendants except as prohibited in Paragraph Two hereof.

6. Culbro shall not obtain any interest in HAV, Holding Company or Havatampa beyond the 25% interest it plans to acquire in Holding Company and the subordinated debentures in the amount of $2,750,000. The Oppenheimer interests shall not dispose of any of their 70% interest in Holding Company.

7. Oppenheimer shall not enter into any agreement with Manufacturers Hanover Trust which would encumber or frustrate any aspect of this hold separate order.

8. If a violation is found and divestiture ordered, then within 120 days of a final judgment of divestiture, or within such shorter period of time after said final judgment as the Court shall order, Culbro shall

760

sell its 25% equity interest in Holding Company. Holding Company agrees to purchase Culbro's 25% interest for evidences of indebtedness within the prescribed time period if no other purchaser can be found.

9. Culbro shall maintain a record of each contact between any officer, director, employee or agent of Culbro and any officer, director, employee, or agent of Oppenheimer, Havatampa, HAV, or Holding Company concerning the business or operations of Havatampa, HAV or Holding Company; provided, however, that contacts between employees involving only routine sales transactions, such as orders, confirmations, invoices, bills and payments, and the exchange of published price lists and catalogs may be excluded. Culbro shall notify each of its officers, directors, employees, and agents who has had or is reasonably expected to have contact with Havatampa of the contents of Paragraphs Two, Five, and Nine of this Order.

The record shall include for each contact the date, form of the contact (whether written or oral), and the identity of each person involved in the contact, and shall specify the subject matter or subject matters of the contact. Culbro shall instruct its employees to report each contact on forms provided by Culbro. The forms shall be forwarded to Culbro's headquarters within three days of the contact and upon receipt the forms shall be incorporated into a log. The log shall be made available for inspection by the Government at Culbro's headquarters at all times during Culbro's normal business hours. A copy of the log shall be submitted to the Antitrust Division in Washington by the tenth day of each month covering all contacts during the preceding calendar month.

10. Jurisdiction is retained in this Court to enter any additional orders or modifications hereof as may become necessary, and any party may apply to the Court for such further relief.